# EXHIBIT B

# OPERATING AGREEMENT

## OF

## OLWIN METAL FABRICATION, LLC

_____

## ARTICLE I.  DEFINITIONS

The following terms, as used in this Operating Agreement, shall have the meanings respectively ascribed to them, unless the context otherwise clearly requires:

(a)  "Articles of Organization" shall mean the Articles of Organization of Olwin Metal Fabrication, LLC as filed with the Secretary of State of Ohio, as the same may be amended from time to time.

(b)  "Capital Account" of a Member shall mean such Member's capital account, as established and maintained pursuant to Article VII of this Operating Agreement.

(c)  "Capital Contribution" shall mean any contribution to the capital of the Company in cash or in property by a Member, whenever made.  "Initial Capital Contribution" shall mean a Member's initial contribution to the capital of the Company pursuant to this Operating Agreement, as set forth in Schedule A annexed hereto and made a part hereof.

(d)  "Code" shall mean the Internal Revenue Code of 1986, as from time to time amended.  "Regulations" shall mean the Treasury Regulations promulgated under the Code.

(e)  "Ohio Act" shall mean the Limited Liability Company Act of Ohio, § 1705.01 et seq., Ohio Revised Code.

(f)  "Company" shall mean Olwin Metal Fabrication, LLC.

(g)  "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year of the Company, after giving effect to the following adjustment:

(i)  credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Regulations, as well as any addition thereto pursuant to the next-to-last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with the Section 1.704 Regulations) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704-2(i)(3)2(d) of the Regulations); and

(ii)  debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of the Regulations Sections 1.704-1(b)(2)(ii) (d) and 1.704-2, and shall be interpreted consistently with those provisions.

(h)  "Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

2

(i)  "<u>Distributable Cash</u>" shall mean all cash, revenues, and funds received by the Company (including Capital Contributions and loan proceeds to the extent the Members determine they are not relevant for the business of the Company), less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business; and (iii) such reserves as the Members deem reasonably necessary to the proper operation of the Company's business.

(j)  "<u>Economic Interest</u>" shall mean a Member's or Economic Interest Owner's share of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Operating Agreement and the Ohio Act, but shall not include any right to participate in the management or the affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members.

(k)  "<u>Economic Interest Owner</u>" shall mean the owner of an Economic Interest who is not a Member.

(l)  "<u>Entity</u>" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or any foreign trust or foreign business organization.

(m)  "<u>Fiscal Year</u>" shall mean the Company's fiscal year, which shall be the calendar year. (The Company's first Fiscal Year shall commence as of June 27, 2011, and end on December 31 of each year thereafter.)

(n)  "<u>Gross Asset Value</u>" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)  The initial Gross Asset Value of any asset contributed by a Member to the Company shall be determined by the contributing Member and the other Members;

3

(ii)  The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Members as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of property (including money); (b) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Members reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)  The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee Member and the other Members; and

(iv)  The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations or pursuant to the provisions of this Operating Agreement.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv) of this definition, then such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

(o)  "Member" shall mean each of the Persons who executes a counterpart of this Operating Agreement as a Member and each of the Persons who may hereafter become a Member.  If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an

Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(p) "Membership Interest" shall mean a Member's entire interest in the Company including, without limitation, such Member's Economic Interest and such other rights and privileges as such Member may enjoy by being a Member. A Member shall retain such Member's voting rights and rights to participate in the affairs of the Company after conveying an Economic Interest to an Economic Interest Owner unless or until the Economic Interest Owner is or becomes a Member.

(q) "Net Profits" or "Net Losses" shall mean for each taxable year of the Company an amount equal to the Company's net taxable income or loss for such year, as the case may be, as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company and in accordance with Section 703 of the Code with the following adjustments:

(i) Any items of income, gain, loss and deduction allocated to Members shall not be taken into account in computing Net Profits or Net Losses;

(ii) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses (pursuant to this definition) shall be added to such taxable income or loss;

(iii) Any expenditure of the Company described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Net Profits or Net Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

(iv) In the event the Gross Asset Value of any Company asset is adjusted pursuant to clause (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(v)  Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; and

(vi)  In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year.

(r)  "Operating Agreement" shall mean this Operating Agreement, as initially executed and as amended from time to time.

(s)  "Person" shall mean any individual or Entity, and the heirs (as defined by the Ohio Revised Code), executors, administrators, legal representatives, successors, and assigns of such "Person," where the context so permits or requires.

(t)  "Reserves" shall mean, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Members for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

(u)  "Voting Interest" shall mean a Member's percentage interest in Net Profits and Net Losses as specified in Article VI of this Operating Agreement.  If a Member has transferred such Member's Economic Interest to an Economic Interest Owner who is not and has not become a Member, the Member transferring such Economic Interest shall retain all voting rights with respect to such Member's Membership Interest.

(v)  "Withdrawal Event" shall mean the death, retirement, resignation, bankruptcy or dissolution of a Member or any other event which dissolves the Company or terminates the continued membership of a Member in the Company.  (For purposes of this Operating Agreement, the term

6

"bankruptcy" with respect to a Member shall mean any of the following: (i) such Member's making of an assignment for the benefit of creditors; (ii) such Member's filing of a voluntary petition in bankruptcy; (iii) such Member's adjudication as a bankrupt or insolvent; (iv) such Member's filing of a petition or answer in any reorganization, arrangement, composition, liquidation, dissolution, or similar relief proceeding under any law that seeks for himself any of those types of relief; or (v) such Member's filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding seeking relief of the nature described in (iv) above.)

## ARTICLE II.  ORGANIZATION

Section 1.  Formation.  The Company was formed on June 27, 2011 by the filing of Articles of Organization with the Secretary of State of Ohio.

Section 2.  Name; Principal Office; Other Offices.  The name of the Company shall be Olwin Metal Fabrication, LLC.  The principal office of the Company shall be at such place within or without the State of Ohio, as may be designated from time to time by the Members.  The initial principal office of the Company shall be located at 2514 Nordic Road, Dayton, OH 45414.  The Company may have such other offices at such other places, within or without the State of Ohio, as the Members may from time to time determine.

Section 3.  Duration.  The Company shall exist for a period which is perpetual, unless earlier dissolved in accordance with the provisions of the Ohio Act or this Operating Agreement.

Section 4.  Nature of Company's Business.  The business of the Company shall be any lawful purpose as permitted by the Ohio Act.

Section 5.  Statutory Agent.  The Company's agent for service of process on the Company shall be Derrick Olwin, 215 N. CHURCH ST., NEW CARLISLE OH 45344.

**<u>ARTICLE III</u>. MEMBERS**

Section 1. <u>Members' Names and Addresses</u>.  The names and addresses of the Members are as follows:

| <u>Name</u> | <u>Address</u> |
|---|---|
| Derrick Olwin - 51% | 7650 West National Road<br>New Carlisle, OH 45344 |
| Joseph Stehle – 49% | 115 North Hampton Road<br>Donnelsville, OH 45319 |

The respective Voting Interests of the Members are specified in Article VI of this Operating Agreement.

Section 2. <u>Limitation of Liability</u>.  Each Member's liability shall be limited in accordance with the provisions of this Operating Agreement, the Ohio Act, and other applicable law.

Section 3. <u>Company's Liability</u>.  Except as otherwise expressly provided by the Ohio Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company.  No Member shall be personally liable in any manner for any debt, obligation or liability of the Company, except only (i) as expressly provided in the Ohio Act, and (ii) with respect to a Member's obligation to make any Capital Contribution for which such Member is obligated under this Operating Agreement.

Section 4. <u>List of Members</u>.  Upon written request of any Member, the other Members shall provide to such requesting Member a list showing the names, addresses, Membership Interests, and, to the extent known by the other Members, Economic Interests, of all Members, and of all Economic Interest Owners.

Section 5. <u>Merger, Consolidation or Sale of Assets</u>. To effect a merger or a consolidation of the Company or a sale or other disposition of all or substantially all of the assets of the Company (otherwise than in the ordinary course of the Company's business), the relevant agreement shall be adopted by all of the Members.

Section 6. <u>Company's Books</u>. The Members shall maintain at the Company's principal office, for the period, if any, required by the Ohio Act, otherwise for the duration of the Company's existence and five (5) years thereafter, all accounts, books, records and other Company documents, including, but not limited to, those specified in § 1705.28 of the Ohio Act. Upon reasonable request, each Member shall have the right, during normal business hours, to examine and copy such Company documents at the requesting Member's expense, subject, however, to the provisions of § 1705.22 of the Ohio Act.

Section 7. <u>No Priority</u>. Except as may be otherwise provided in this Operating Agreement, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses, or distributions; provided, however, that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**ARTICLE IV**. **MEETINGS OF MEMBERS; RESTRICTIONS UPON TRANSFERABILITY OF INTERESTS**

Section 1. <u>Annual Meeting</u>. The annual meeting of Members shall be held on the first day of March of each year (beginning in the year 2019) for the purpose of considering such reports as may be presented at such meeting and acting upon such matters as may properly come before such meeting.

Section 2. <u>Special Meetings</u>. Special meetings of Members may be called by the holder or holders of fifty percent (50%) or more of the Voting Interests by action at a meeting, or by action without a meeting.

Section 3. <u>Place of Meeting</u>. Any meeting of the Members may be held either at the principal office of the Company or at such other place within or without the State of Ohio as may be designated in the notice of such meeting.

Section 4. <u>Notice of Meeting</u>. Unless waived, a written notice of each annual or special meeting of Members stating the day, hour, place, and the purpose or purposes thereof, shall be served upon or mailed to each Member of record entitled to vote thereat, not more than sixty (60) days nor less than seven (7) days before such meeting. If mailed, such notice shall be directed to a Member at such Member's address as the same appears upon the records of the Company, and shall be considered to have been given on the day the same is mailed.

Section 5. <u>Waiver of Notice</u>. Any Member, either before, at or after any meeting, may waive in writing any notice required to be given by law or under this Operating Agreement; and whenever all of the Members entitled to vote shall meet in person or by proxy and consent to hold a meeting, it shall be valid for all purposes without call or notice, and at such meeting any action may be taken.

Section 6. <u>Quorum and Voting</u>. At any meeting of the Members, the presence at the meeting in person or by proxy of Members holding a majority of the Voting Interests shall constitute a quorum. At any meeting at which a quorum is present, the Members may proceed to transact all business properly brought before such meeting. Except as otherwise provided in this Operating Agreement, all questions which shall come before such meeting shall be determined by the unanimous vote of the Members. At any meeting, whether a quorum is present or not, Members holding a majority of the Voting Interests represented in person or by proxy may adjourn the meeting from time to time and place to place without notice other than an announcement at the meeting of the time and place fixed for holding such adjourned meeting. At any such adjourned meeting at which a quorum is present, any business may be transacted which could have been transacted at the meeting as initially noticed or held. In the event of a dispute between Derrick Olwin and Joe Stehle, Derrick Olwin's decision shall be final.

Section 7. <u>Proxies</u>. Any Member of record who is entitled to attend or vote at a Members' meeting or to execute consents, waivers, or releases, shall be entitled to be represented at such meeting or to vote thereat and to execute consents, waivers, and releases, as the case may be, through an appointee or appointees designated in writing signed by such Member, which need not be sealed, witnessed, or acknowledged. Every proxy must be in writing and executed by the Member or by his duly authorized attorney. No proxy shall be valid after the expiration of eleven (11) months from the date of its execution unless the Member executing it shall have specified therein the date on which it is to expire or the length of time it is to continue in force.

Section 8. <u>Financial Reports</u>. At the annual meeting of Members, or the meeting held in lieu thereof, a financial statement of the Company for the most recent Fiscal Year shall be laid before the Members.

Section 9. <u>Action Without a Meeting</u>. Any action which may be authorized or taken at a meeting of the Members may be authorized or taken without a meeting in a writing or writings signed by Members holding one hundred percent (100%) of the Voting Interests.

Section 10. <u>Restrictions upon Transferability of Interests</u>. Notwithstanding any other provision hereof to the contrary, if the remaining Members do not approve by vote or consent of holders of all of the Voting Interests held by the remaining Members, the proposed disposition (pursuant to sale, gift, pledge, mortgage, levy, attachment, judicial sale, judicial decree (including, without limitation, a decree of divorce, alimony only, separate maintenance or dissolution, whether interlocutory or final), foreclosure, death (pursuant to will, codicil or otherwise), operation of law, or otherwise), of a transferring Member's Membership Interest or Economic Interest to a transferee who is not a Member immediately prior to the disposition, then the proposed transferee shall have no right to participate in the business and affairs of the Company or to become a Member. Such transferee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of

11

an Economic Interest or any other transfer which has not been approved) shall be effective as against the Company unless and until written notice (including the name and address of the proposed transferee and the date of such transfer) has been provided to the Company and the non-transferring Members.

Section 11. <u>Limitation of Interests of Spouses</u>. Presently, neither of the Members are married. The preceding section, Article IV, Section 10, would prohibit a transfer to any party becoming a full member.

Instead, any transferee would be merely an economic interest owner. In the event either Member intended to marry, that Member shall obtain the consent of the prospective spouse, in the form of a prenuptial agreement, consenting to the terms set forth in this Operating Agreement and agreeing that said prospective spouse shall never become a member of the Company. The prospective spouse may, depending upon the law and other terms in the prenuptial agreement, be entitled to a claim for value based upon the appreciation of the Company during the time of the marriage, but such claim shall be a claim for monetary value only and shall not have any claim upon the membership interests provided for in this Operating Agreement.

**<u>ARTICLE V</u>. MANAGEMENT.**

Section 1. <u>Management; Authority of Members</u>

(a) The management of the Company shall be vested in and exercised by the Members.

(b) Except to the extent otherwise provided by law or this Operating Agreement, all of the authority of the Company shall be exercised by or under the direction of the Members, including, without limitation, the following authority:

(i) To appoint, and, at their discretion, with or without cause, to remove or suspend officers, supervisors, and employees, as the Members may from time to time consider advisable; and to determine the duties and fix the compensation of all officers, supervisors, and employees; and

(ii)  To designate a depositary or depositaries of the funds of the Company and the individuals who shall be authorized to sign checks, drafts, contracts, deeds, mortgages, notes, and other instruments on behalf of the Company.  All Members must sign checks, drafts, contracts, deeds, mortgages, notes and other instruments on behalf of the Company.

Section 2.  <u>Certain Limitations</u>.  The Members' exercise of their authority hereunder shall be subject to the certain limitations thereon set forth in § 1705.25(A) of the Ohio Act.


**ARTICLE VI.  ALLOCATIONS**

Net Profits or Net Losses, as the case may be, of the Company shall be allocated to the Members in the following proportions:

| <u>Name</u> | <u>Percentage</u> |
|---|---|
| Derrick Olwin | 51% |
| Joseph Stehle | 49% |
| **Total** | **100%** |

All Net Profits or Net Losses allocated to a Member in accordance with the provisions of this Article VI shall be credited or charged, as the case may be, to the Capital Account of such Member.  Any allocation to a Member of a portion of the Net Profits or Net Losses of the Company shall be a proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Company for federal income tax purposes.


**ARTICLE VII.  CAPITAL ACCOUNTS; DISTRIBUTIONS; REIMBURSEMENT**

Section 1.  <u>Capital Accounts</u>.  Each Member shall contribute such amount (in cash or in property) as is set forth in Schedule A annexed hereto and made a part hereof, as such Member's Initial Capital

13

Contribution. Each Member's Capital Account shall be maintained in accordance with the following provisions:

(a) A separate Capital Account shall be maintained for each Member. Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company; (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (iii) allocations to such Member of Net Profits; (iv) any items in the nature of income and gain which are specially allocated to the Member pursuant to this Operating Agreement; and (v) allocations to such Member of income described in Section 705(a)(1)(B) of the Code. Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (iii) allocations to such Member of expenditures described in Section 705(a) (2)(B) of the Code; (iv) any items in the nature of deduction and loss that are specially allocated to the Member pursuant to this Operating Agreement; and (v) allocations to the account of such Member of Net Losses. The Capital Accounts shall be further adjusted as provided in Section 704 of the Code and the Regulations promulgated thereunder.

(b) In the event of a sale or exchange of a Membership Interest or an Economic Interest, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Regulations.

(c) If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section should be modified in order to comply with Section 704(b) of the Code and the Regulations thereunder, then, notwithstanding

14

any other provision hereof to the contrary, the method by which Capital Accounts are maintained shall be so modified, but only if such change in the manner of maintaining Capital Accounts does not materially alter the economic agreement between or among the Members.

        (d)  Upon liquidation of the Company (or any Members' Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions shall be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.  The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member or Economic Interest Owner.

        (e)  Except as otherwise required by law, no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

        (f)  A Member shall not receive out of the Company's property any part of his Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

        (g)  A Member, irrespective of the nature of such Member's Capital Contribution, has only the right to demand and receive cash in return for such Member's Capital Contribution.

It is the intent of the Members that the provisions of this Operating Agreement relating to the maintenance of Capital Accounts shall comply with Code Section 704 and the Regulations thereunder, and such provisions shall be interpreted and applied in a manner consistent with such Regulations.  The Members shall have the right to modify the manner in which Capital Accounts are maintained if the

purpose of such modification is to achieve better compliance with such Regulations; provided, however, that such modification does not materially affect the amount distributable to any Member upon the dissolution of the Company.

Section 2.  <u>Distributions</u>.  The Company shall distribute Distributable Cash to the Members in accordance with their respective interests in Net Profits and Net Losses, to the extent and at such times as the Members shall determine.

**<u>ARTICLE VIII.</u>  TAX RETURNS; TAX ACCOUNTING; TAX ELECTIONS**

Section 1.  <u>Preparation of Tax Returns</u>.  Federal, state and local income tax returns of the Company shall be prepared and filed under the direction of the Tax Matters Member (hereinafter referred to in Section 4 of this Article).  Copies of tax returns of the Company for specified Fiscal Year(s) shall be furnished to a Member upon written request therefor.

Section 2.  <u>Section 754 Election</u>.  The Company shall, if requested by any Member and approved by Members holding a majority of the Voting Interests held by the other Members, make the election under Section 754 of the Code.

Section 3.  <u>Tax Elections Generally</u>.  Tax elections for the Company not expressly provided for herein shall be approved by the Members.

Section 4.  <u>Tax Matters Member</u>.  Derrick Olwin, as Tax Matters Member, shall be and shall have all of the authority and duties of a "tax matters partner" under Sections 6221-6233 of the Code and the Regulations thereunder.  The Members shall perform all acts required under Code Section 6231 and the Regulations thereunder to designate Derrick Olwin as Tax Matters Member.  The Members may at any time remove a Tax Matters Member and appoint a substitute Tax Matters Member.  For purposes of this Section, the term "Tax Matters Member" shall have the meaning ascribed to "tax matters partner" in Section 6231(a)(7) of the Code.

Section 5.  <u>No Termination</u>.  No Member shall take any action or permit any transfer of a Membership Interest or an Economic Interest that would effect a termination of the Company within the meaning of Section 708 of the Code without the express written consent of holders of a majority of the Voting Interests.

Section 6.  <u>Special Allocations to Capital Accounts and Certain Other Income Tax Allocations</u>.

(a)  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4),(5), or (6) of the Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent of the Members that this Section 6(a) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Regulations.

(b)  In the event that any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Section 1.704-1(b)(2)(ii)(c) of the Regulations and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(c)  Notwithstanding any other provision of this Section 6, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member shall be allocated items of income (including gross

17

income) and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company minimum gain. This Section 6(c) is intended to comply with the minimum gain chargeback requirements of Section 1.704-2 of the Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may in their discretion seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(d) Items of Company loss, deduction and expenditure described in Code Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Regulations.

(e) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Regulations) such deductions shall be allocated to the Members in the same manner as Net Profits or Net Losses are allocated for such period.

(f) In accordance with Section 704(c)(1)(A) of the Code and Section 1.704-1(b)(2)(i), (iv), of the Regulations, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, **solely for federal income tax purposes** (and not for Capital Account purposes), be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(g) Pursuant to Section 704(c)(1)(B) of the Code, if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Section 704(c)(2) of the Code, the contributing Member shall, **solely for**

**federal income tax purposes** (and not for Capital Account purposes), be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Section 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

(h)  In the case of any distribution by the Company to a Member or Economic Interest Owner, such Member or Economic Interest Owner shall, **solely for federal income tax purposes** (and not for Capital Account purposes), be treated as recognizing gain in an amount equal to the lesser of:

(i)  the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution; or

(ii)  the net precontribution gain (as defined in Section 737(b) of the Code) of the Member or Economic Interest Owner.  (The net precontribution gain means the net gain (if any) which would have been recognized by the distributee Member or Economic Interest Owner under Section 704(c)(1)(B) of the Code if all property which: (1) had been contributed to the Company by the distributee Member or Economic Interest Owner within five (5) years of the distribution; and (2) is held by the Company immediately before the distribution, had been distributed by the Company to another Member or Economic Interest Owner.  If any portion of the property distributed consists of property which had been contributed by the distributee Member or Economic Interest Owner to the Company, then such property shall not be taken into account under this Section 6(h) and shall not be taken into account in determining the amount of the net precontribution gain.  If the property distributed consists of an interest in an Entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such Entity after such interest had been contributed to the Company.

(i)  All recapture of income tax deductions resulting from sale or other disposition of Company property shall be allocated to the Members to whom the deductions that gave rise to such recapture were allocated hereunder to the extent that such Members are allocated any gain from the sale or other disposition of such property.

(j)  Any credit or charge to the Capital Accounts of the Members pursuant to Sections 6(a), (b), (c), (d), and/or (e) hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to this Section 6, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 6(a), (b), (c), (d), and/or (e) shall to the extent possible be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article VIII if the special allocations required by Sections 6 (a), (b), (c), (d), and/or (e) hereof had not occurred.

**ARTICLE IX.  CERTAIN TRANSACTIONS; INDEMNIFICATION**

Section 1.  <u>Certain Transactions</u>.  No contract, action, or transaction shall be void or voidable with respect to the Company because it is between or affects the Company and one or more of its Members, or because it is between or affects the Company and any other Entity in which one or more of its Members are members, managers, directors, trustees, or officers or have a financial or personal interest, or because one or more interested Members participate in or vote at the meeting that authorizes the contract, action, or transaction, if in any such case either of the following applies:  (a) the material facts as to his or their relationship or interest and as to the contract, action, or transaction are disclosed or are known to the Members entitled to vote on the contract, action, or transaction, and the contract, action, or transaction is specifically approved at a meeting of the Members held for that purpose by the affirmative vote of the Members entitled to exercise a majority of the Voting Interests held by Members

not interested in the contract, action, or transaction; or (b) the contract, action, or transaction is fair to the Company as of the time it is authorized or approved by the Members.

Section 2.  <u>Indemnification</u>.  The Company shall indemnify each Person who was or is a party, or who is threatened to be made a party, to any threatened, pending, or completed civil, criminal, administrative, or investigative action, suit, or proceeding, because he is or was a Member, employee, or agent of the Company or is or was serving at the request of the Company as a manager, director, trustee, officer, employee, or agent of another Entity.  In such case, the Company shall indemnify such Person against expenses, including attorney's fees, judgments, fines, and amounts paid in settlement that actually and reasonably were incurred by him in connection with the action, suit, or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and, in connection with any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.  The termination of any such action, suit, or proceeding by judgment, order, settlement, or conviction or upon a plea of *nolo contendere* or its equivalent does not create of itself a presumption that the Person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and, in connection with any criminal action or proceeding, a presumption that he had reasonable cause to believe that his conduct was unlawful. Provided, however, that such indemnification shall not be afforded in respect of any action by or in the right of the Company, if the Person is adjudged to be liable for negligence or misconduct in the performance of his duty to the Company (except to the extent that the court in which the action or suit was brought determines, upon application, that, despite the adjudication of liability but in view of all of the circumstances of the case, the Person is fairly and reasonably entitled to indemnification for expenses that the court considers proper).  Indemnification hereunder shall be further subject to the provisions of § 1705.32(C) and (D) of the Ohio Act.  Indemnification hereunder shall not be exclusive of and shall be in addition to any other rights of indemnification to which such Person shall be entitled, including, without

limitation of the generality of the foregoing, rights under any policy of insurance maintained by the Company.

**ARTICLE X.  DISSOLUTION; WINDING UP**

Section 1.  <u>Dissolution</u>.

(a)  The Company shall be dissolved upon the occurrence of any of the following events:

(i)  when the period fixed for the duration of the Company (as provided in Article II, Section 3, of this Operating Agreement) expires;

(ii)  by the agreement of Members holding two-thirds of the Voting Interests;

(iii)  upon any Withdrawal Event (other than the bankruptcy of a Member), unless the business of the Company is continued by the consent of remaining Members holding at least a majority of the Voting Interests held by remaining Members, given within ninety (90) days after such Withdrawal Event;

(iv)  At any time there is fewer than one (1) Member;

(v)  Upon entry of a decree of judicial dissolution under § 1705.47 of the Ohio Act.

(b)  If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, such Member's executor, administrator, guardian, conservator, or other legal representative ("Successor") may exercise all of such Member's rights for the purpose of settling his estate or administering his property; provided, however, that, for purposes of this Operating Agreement, such Successor shall not be considered a Member and shall have no right to vote upon or consent to any matter pursuant to the provisions of this Operating Agreement, except only as otherwise expressly required by § 1705.21(A) of the Ohio Act.

(c)  Except as expressly permitted by this Operating Agreement, a Member shall not voluntarily resign or take any other voluntary action which directly causes a Withdrawal Event.  Unless otherwise approved by Members owning a majority of the Voting Interests, a Member ("Resigning Member") who in violation of this Operating Agreement resigns or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Resigning Member, shall be entitled to receive only those distributions to which such Resigning Member would have been entitled had such Resigning Member remained a Member (and only at such times as such distributions would have been made had such Resigning Member remained a Member).  Except as otherwise expressly provided herein, a Resigning Member shall become an Economic Interest Owner.  Damages incurred as a result of any breach of this Operating Agreement by a Resigning Member may be offset against distributions by the Company to which such Resigning Member would otherwise be entitled.

Section 2.  <u>Effect of Dissolution</u>.  Upon its dissolution, the Company shall cease to carry on its business, except as may be necessary for the winding up of its affairs, but its separate existence shall continue until a Certificate of Dissolution has been delivered to and filed by the Secretary of State of Ohio (as hereinafter provided in Section 4 of this Article) or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

Section 3. <u>Winding Up; Liquidation and Distribution of Assets</u>.

(a)  Upon dissolution of the Company, an accounting shall be made by the Members of the accounts of the Company and of the Company's assets and liabilities, from the date of the next preceding accounting until the date of dissolution.  The Members shall thereupon proceed to wind up the affairs of the Company.

(b)  If the Company is dissolved and its affairs are to be wound up, the Members shall:

(i)  Sell or otherwise liquidate all of the Company's assets (except to the extent that the Members determine to distribute any assets to the Members in kind);

(ii)  Allocate any Net Profits or Net Losses resulting from such sales or liquidations to the Members' and Economic Interest Owners' Capital Accounts;

(iii)  Discharge or make reasonable provision for the discharge of all known liabilities of the Company, including, without limitation, liabilities to Members and Economic Interest Owners who are also creditors, to the extent permitted by law, other than liabilities to Members and Economic Interest Owners for distributions and the return of their Capital Contributions; and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of Members and Economic Interest Owners, the amounts of such Reserves to be deemed an expense of the Company);

(iv)  Distribute the remaining assets of the Company in the following order:

(1)  If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by the Members.  Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale(s).

(2)  The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed in kind, as determined by the Members, with all assets distributed in kind being valued for this purpose at their fair market value.  Any such distributions to Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations.

(3)  Any distributions to Members shall be applied, first, to the return of their Capital Contributions, and, second, with respect to their Membership Interests.

(v)  Perform every other act that may be necessary or appropriate, in the discretion of the Members, to wind up the Company's affairs; to liquidate and distribute its assets; and to discharge or provide for the discharge of its liabilities; all in conformance to applicable law.

(c)  Notwithstanding any other provision of this Operating Agreement to the contrary, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(d)  Upon completion of the winding up, including, without limitation, the liquidation and distribution of all of the assets of the Company, the Company shall be deemed terminated.

Section 4.  <u>Certificate of Dissolution</u>.  When all known debts and liabilities of the Company have been paid or provision has been made for the payment thereof and all remaining assets of the Company have been distributed as provided herein, the Members shall cause to be executed and delivered to the Secretary of State of Ohio for filing the requisite Certificate of Dissolution on a form that is prescribed by the Secretary of State of Ohio.  Upon the filing of the Certificate of Dissolution, the existence of the Company shall cease, except for the purpose of the commencement or continuance of suits or other proceedings by or against the Company as permitted by the Ohio Act.  The Members shall have authority to distribute any Company property discovered after the filing of the Certificate of Dissolution and take such other post-dissolution actions as may be necessary or appropriate on behalf of and in the name of the Company.

Section 5. <u>Return of Capital Contribution; No Recourse Against Other Members</u>. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution. If Company property remaining after payment of or provision for the debts and liabilities of the Company is insufficient to fully return the Capital Contribution(s) of one or more Members, such Member or Members shall have no recourse against any other Member.

## **ARTICLE XI. OTHER**

Section 1. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

Section 2. <u>Amendment</u>. This Operating Agreement may be amended, supplemented, or repealed only by an instrument in writing, which has been approved by the affirmative vote or consent of holders of all of Voting Interests.

Section 3. <u>Inconsistency</u>. If any provision of this Operating Agreement shall be inconsistent with the Articles of Organization, the Articles of Organization shall govern.

Section 4. <u>No Third-Party Rights</u>. None of the provisions of this Operating Agreement shall operate for the benefit of or be enforceable by any third-party creditor(s) or other claimant(s) of the Company.

Section 5. <u>Investment Representations</u>. The undersigned Members and Economic Interest Owners, if any, understand (1) that the Membership Interests and Economic Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, as amended, the Ohio Securities Act (Chapter 1707, Ohio Revised Code) or any other state securities laws (collectively the "Securities Acts") because the Company is issuing such Membership Interests and Economic Interests in reliance upon one or more of the exemptions from registration under the Securities Acts, and (2) that the

Company has relied upon the fact that the Membership Interests and Economic Interests are to be held by each Member or Economic Interest Owner for investment, and not with a view to distribution. Accordingly, each Member or Economic Interest Owner hereby represents to the Company that such Member or Economic Interest Owner is acquiring Membership Interests or Economic Interests for such own Member's or Economic Interest Owner's own account, for purposes of investment and not with a view to the resale or distribution thereof. Each Member or Economic Interest Owner agrees not to sell or offer for sale or otherwise transfer or offer to transfer any portion of such Membership Interests or Economic Interests unless there is then an effective registration or other qualification relating thereto under the Securities Acts or unless the holder of Membership Interests or Economic Interests delivers to the Company an opinion of counsel, satisfactory to the Company, to the effect that such registration or other qualification under such Securities Acts is not required in connection with such sale, transfer, or offer. Each Member and Economic Interest Owner understands that the Company is under no obligation to register the Membership Interests or Economic Interests or to assist such Member or Economic Interest Owner in complying with the requirements of any exemption from registration under the Securities Acts if such Member or Economic Interest Owner should at a later date wish to sell or otherwise dispose of his Membership Interest or Economic Interest.

Section 6. <u>Notice</u>. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been given if delivered personally to the Person or to an executive officer of the Person to whom the same is directed or, if mailed by U.S. Mail, postage prepaid, addressed to such Person's address, as set forth on the records of the Company. Except as otherwise expressly provided herein, any such notice shall be deemed to be given four (4) business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed as aforesaid.

Section 7.  <u>Binding Effect</u>.  This Operating Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, personal representatives, and assigns.

Section 8.  <u>Entire Agreement</u>.  All understandings and agreements heretofore made by and among the Members, or any of them, with respect to the subject matter hereof, are merged in this Operating Agreement and the writings specifically referred to herein, which alone fully and completely express their agreement with respect to the subject matter hereof.

Section 9.  <u>Severability</u>.  In the event that any provision hereof is determined to be invalid or unenforceable, by a court of competent jurisdiction, such determination shall not affect nor impair the validity or enforceability of any of the remaining provisions of this Operating Agreement that may be given independent effect.

Section 10.  <u>Captions</u>.  The Section captions and headings herein are included for purposes of convenience of reference only and shall not be considered in connection with any construction or interpretation of this Operating Agreement or any of the provisions hereof.

Section 11.  <u>Counterparts</u>.  This Operating Agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

Section 12.  <u>Number; Gender</u>.  As used herein, the singular number includes the plural number, and the plural, the singular, and the masculine gender includes the feminine or neuter gender, in each case, as the context requires.

IN WITNESS WHEREOF, the undersigned Members have executed this Operating Agreement as of the 27th day of June, 2011.

28

Derrick Olwin, Member

Joseph Stehle, Member

(being all of the Members of the Company)

## SCHEDULE A

**Annexed To and Made a Part of the Operating Agreement
dated June 27, 2011 relating to
OLWIN METAL FABRICATION, LLC
(an Ohio limited liability company)**

### INITIAL CAPITAL CONTRIBUTIONS

Derrick Olwin contributes the sum of                    $102.00

Joseph Stehle contributes the sum of                    $ 98.00

                                                        _____

Total Initial Capital Contributions                     $200.00